## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| V.M., on behalf of B.M., | : | Civ. No. 12-892 (KM) |
| | : | |
| **Plaintiff,** | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| SPARTA TOWNSHIP BOARD OF EDUCATION, | : | |
| | : | |
| **Defendant.** | : | |

---

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff V.M. filed this lawsuit on behalf of her son, B.M., against the Sparta Township Board of Education (hereinafter, "Sparta"). B.M. allegedly suffers from dyslexia, attention deficit hyperactivity disorder, and deficits in his ability to read, write, and calculate. In July 2009, Sparta determined that B.M. was not eligible for special education services, finding that he was not a child with a disability. V.M. appealed that determination to the New Jersey Department of Education. After eight days of hearings, an Administrative Law Judge upheld Sparta's determination. V.M. then brought this suit pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i)(2), seeking to overturn the denial by Sparta, as upheld by the ALJ.

V.M. asserts here that B.M. has a specific learning disability (SLD) or other health impairment that entitles him to special education services at public expense. Sparta's erroneous decision, she contends, flowed from a flawed procedure: specifically, Sparta's failure to consider factors that must be considered under IDEA and its federal and state implementing regulations.

The circumstances are unfortunate. It appears that, in *evaluating* B.M., well-intentioned professionals gathered a wide range of information, and I do not fault their efforts. Sparta's protocol for *deciding* whether B.M. had a disability, however, effectively set aside the results of that investigation. Sparta found B.M. ineligible based upon a single formula, to the exclusion of other factors that it was legally required to consider. That was a violation of the decisional procedures and methods prescribed by IDEA and its implementing regulations, both federal and state. An ALJ, affirming the local decision, addressed the facts, but did not address the error in Sparta's decisional

methodology. The ALJ's decision—essentially, upholding Sparta's decision because it complied with Sparta's flawed decisional protocol— did not get at the root of the problem.

It is not impossible that Sparta, if it had properly considered all of the relevant factors, could have permissibly reached the same result. I am, however, constrained by law to find that it erred as a matter of law in deciding in the manner that it did. I will, however, request that the parties submit additional briefing on the remedies for such a violation, after appropriate discovery, as explained further in Part V of this opinion.

## I.   THE IDEA STATUTE AND THE PROCEDURE FOR ELIGIBILITY DETERMINATIONS

### A. The IDEA Statute

IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designated to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). States have an obligation to ensure that children with disabilities receive a "free appropriate public education, or "FAPE," 20 U.S.C. § 1412(a)(1), in the form of special education "provided at public expense, under public supervision and direction." 20 U.S.C. § 1401(8). Such special education will be provided "in conformity with the individualized education program required under Section 1414(d) of this title." *Id.*

A "child with a disability" is a "child [] with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness)...other health impairments, or specific learning disabilities, and [] who, by reason thereof, needs special education and related services." *Id.* at 1401(3) (emphasis added).

A specific learning disability (or SLD) is "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, read, write, spell, or do mathematical calculations...includ[ing] perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and development aphasia." *Id.* at 1401(30); N.J.A.C. § 6A:14-3.5(c)(12).

### B. The Eligibility Determination Process Under IDEA

Under the IDEA, the eligibility determination process has two essential stages: (1) the evaluations and written reports, and (2) the eligibility determination meeting.

2

## 1. Evaluations and written reports

IDEA requires local education agencies (typically, school boards) to conduct "full and individual evaluation[s]" consisting of procedures "to determine whether a child is a child with a disability." 20 U.S.C. § 1414(a)(1)-(2). These should include reevaluations as changing circumstances warrant. *Id.*

"In conducting the evaluation, the local educational agency shall [] use a variety of assessment tools and strategies to gather relevant functional, development, and academic information, including information provided by the parent, that may assist in determining [] whether the child is a child with a disability," and shall "not use any single measure of assessment as the sole criterion for determining whether a child is a child with a disability. *Id.* at § 1414(b)(2); 34 C.F.R. § 300.304(b)(1)-(2). In other words, IDEA requires that evaluation be multi-faceted and multi-disciplinary, and the process must include input from the parents.

A state "may fashion its own procedures" for evaluating disability, so long as it satisfies IDEA's requirements. *Shore Regional H.S. Bd. of Ed. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004). In New Jersey, local school districts assemble a Child Study Team (CST), which "shall include a school psychologist, a learning disabilities teacher-consultant and a school social worker." N.J.A.C. § 6A:14-3.1(b). The CST, along with properly licensed specialists in the area of disability (as appropriate), *id.* at § 6A:14-3.1(c), participate as team members in both the evaluation of potentially eligible students and in the actual eligibility determination, *id.* at § 6A:14-3.1(d). A parent or knowledgeable regular education teacher may assist the CST in determining what data it should obtain and which specialists should conduct assessments in the evaluation, and they may participate in the eligibility determination meeting. (*See* Section I.B.2, *infra*.) They are not, however, part of the CST. *See id.* at § 6A:14-3.4(a).

Each evaluation must "[i]nclude a functional assessment of academic performance and, where appropriate, a functional behavioral assessment [and/or] assessment of the student's communication needs[.]" *Id.* at § 6A:14-3.4(f)(4). All standardized tests used for the evaluation must be "individually administered," "valid and reliable," "normed on a representative population," and "scored as either standard score with standard deviation or norm referenced scores with a cutoff score." *Id.* at § 6A:14-3.4(f)(3). In addition, at least one evaluator "shall observe the student's academic performance in the general education classroom"; shall interview the student's parent; shall interview the teacher(s) referring the student; shall "review [] the student's developmental/educational history including records and interviews"; shall review "interventions documented by the classroom teacher(s) and others who work with the student"; and shall utilize "[o]ne or more informal measure(s) which may include, but not be limited to, surveys and inventories; analysis of work; trial teaching; self-report; criterion referenced tests; curriculum based

3

assessment; and informal rating scales." *Id.* at § 6A:14-3.4(f)(4)(i)-(vi). *See also* 34 CFR § 300.310(a) (requiring observation in classroom).

The child's parent(s) may submit reports and assessments from professionals in private practice or from certain other third parties. N.J.A.C. § 6A:14-3.4(i). Each such report must be "reviewed and considered by the child study team member or related services provider with relevant knowledge or expertise." *Id.* In addition, the CST may treat any such report "as [fulfilling] a required assessment, if the assessment has been conducted within one year of the evaluation and the child study team determines the report and assessment meet the requirements of (h) above." In other words, the CST must consider any assessment submitted by parents, and may adopt such an assessment as its own.

Upon completing its evaluation, the CST must prepare "[a] written report of the results of each assessment." *Id.* at § 6A:14-3.4(h)(1). The report may be produced "collaboratively by the evaluators," or compiled from the evaluators' individual written reports of their assessments.[1] *Id.* "Each written report shall be dated and signed by the individual(s) who conducted the assessment and shall include: 1. An appraisal of the student's current functioning and an analysis of instructional implication(s) appropriate to the professional discipline of the evaluator; 2. A statement regarding relevant behavior of the student, either reported or observed and the relationship of that behavior to the student's academic functioning; [and] 3. If an assessment is not conducted under standard conditions, the extent to which it varied from standard conditions." *Id.* at § 6A:14-3.4(h)(1)-(3).

### 2. Determination of eligibility in writing

Once the evaluation of the student is complete, the school district is to convene a meeting to determine whether the student is eligible for special education. *Id.* at § 6A:14-3.5(a). At this meeting, eligibility is to "be determined collaboratively" by the parent, a teacher "knowledgeable about the student's educational performance" (or knowledgeable about the district's programs, if there are no such teachers), the student (where appropriate), at least one CST member who participated in the evaluation, the case manager, and other appropriate individuals at the discretion of the parent or school district (collectively, "Eligibility Meeting Participants"). *Id.*; *id.* at § 6A:14-2.3(k)(1). *See also* 34 C.F.R. § 300.306(a)(1).

---

[1] If the evaluators prepare individual reports, "each team member shall certify in writing whether his or her report is in accordance with the conclusion of eligibility of the student. If his or her report does not reflect the conclusion of eligibility, the team member must submit a separate statement presenting his or her conclusions." *Id.* at § 6A:14-3.4(h)(5).

In determining eligibility and educational need, the school district's interpretation of evaluation data "must [] draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior," and must "ensure that information obtained from all of these sources is documented and carefully considered." 34 C.F.R. § 300.306(c) (emphasis added). Thus, federal regulations require school districts to draw upon a wide range of the data collected in its evaluation, documenting and carefully considering the data in arriving at its eligibility determination.

New Jersey's regulations go one step farther, providing that "[c]lassification shall be based on all assessments conducted including assessment by child study team members and assessment by other specialists as specified below." N.J.A.C. § 6A:14-3.5(c) (emphasis added).

The school district must determine a student eligible for special education if its Eligibility Meeting Participants find that the student meets the classifications for one or more of the fourteen disabilities set forth in N.J.A.C. § 6A:14-3.5(c), which include autism, communication impaired, specific learning disability (SLD), and other health impaired. Id.

To classify a student as having a SLD, the Eligibility Meeting Participants must find that a student has "a disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and development aphasia." Id. at § 6A:14-3.5(c)(12).

New Jersey's regulations set forth two methods for the Eligibility Meeting Participants to find the disorder constituting an SLD. The first is the 'severe discrepancy' approach, by which the participants determine whether there is a "severe discrepancy [] between the student's current achievement and intellectual ability in one or more of [] (1) Basic reading skills; (2) Reading comprehension; (3) Oral expression; (4) Listening comprehension; (5) Mathematical calculation; (6) Mathematical problem solving; (7) written expression; and (8) Reading fluency." Id. at § 6A:14-3.5(c)(12)(i). Alternatively, the participants may also "utilize[e] a response to scientifically based interventions methodology as described in N.J.A.C. 6A:14-3.4(h)6." Id. at § 6A:14-3.5(c)(12)(ii).[2] Here, Sparta opted for the 'severe discrepancy' method set forth in subsection 12(i) of the regulation.

---

[2] This is consistent with the operative federal regulation, which requires that a school district not be required to use the severe discrepancy method, and that a state allow alternatives to this approach to classifying a student as SLD. See 34 C.F.R. §

If a school district uses the severe discrepancy approach, New Jersey regulation requires it to "adopt procedures that utilize a statistical formula and criteria for determining severe discrepancy." *Id.* at § 6A:14-3.5(c)(12)(iv); *see also* 34 C.F.R. § 300.307(b)(requiring districts to "use the State criteria adopted pursuant to paragraph (a) of this section in determining whether a child has a [SLD]"); *but cf. id.* at § 300.309(a)(1)-(2)(setting forth broader criteria for finding an SLD and omitting any reference to the severe discrepancy approach).

Thus, a district may lawfully employ the severe discrepancy method. If it does, must use a statistical formula. The question is whether such a formula may be the sole determinant in classifying a student as SLD or not.

Whatever the methodology, however, the school district must, upon rendering a SLD classification determination, document particular findings in writing. N.J.A.C. § 6A:14-3.4(h)(4) provides: "[T]he documentation of the determination of eligibility shall include a statement of: i. Whether the student has a specific learning disability; ii. The basis for making the determination; iii. The relevant behavior noted during the observation; iv. The relationship of that behavior to the student's academic performance; v. Educationally relevant medical findings, if any; vi. If a severe discrepancy methodology is utilized, whether there is a severe discrepancy between achievement and ability that is not correctable without special education and related services; vii. The determination concerning the effects of environmental, cultural or economic disadvantage; viii. Whether the student achieves commensurate with his or her age; ix. If a response to scientifically based interventions methodology is utilized, the instructional strategies utilized and the student-centered data collected with respect to the student; and x. Whether there are strengths or weaknesses, or both, in performance or achievement relative to intellectual development in one of the following areas that require special education and related services: (1) Oral expression; (2) Listening comprehension; (3) Written expression; (4) Basic reading skill; (5) Reading fluency skills; (6) Reading comprehension; (7) Mathematics calculation; and (8) Mathematics problem solving."

### C. Challenging Adverse Determinations Before Administrative Agency, and the Right to Sue in Federal Court

"The IDEA establishes a private cause of action against a school district that fails to abide by its legal obligations. The parent or guardian of a minor student who is denied the rights and procedures set forth in the IDEA is afforded the opportunity to file an administrative complaint and to appeal an

---

300.30(a). Thus New Jersey's regulation, although requiring the use of a formula when the severe discrepancy method is used, permits other approaches to finding an SLD (namely, the "response to scientifically based interventions methodology"). N.J.A.C. §§ 6A:14-3.5(c)(12)(ii); 6A:14-3.4(h)(6).

adverse determination to a federal district court." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66-67 (3d Cir. 2010) (citing 20 U.S.C. §§ 1415(b)(6), (i)(2)).

A parent dissatisfied with a district's determination, including a parent who has unilaterally placed the child in a different school, may "present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child," 20 U.S.C. § 1415(b)(6), and be heard in "an impartial due process hearing, which shall be conducted by the State educational agency." *See* 20 U.S.C. § 1415(f)(1)(A); Thus, a parent may challenge the district's determination, and the procedures utilized by the district, in an administrative proceeding. *See id.; see also* N.J.A.C. § 6A:14-2.7. If aggrieved by the decision of the administrative court, the parent(s)may then bring an action "with respect to the complaint presented pursuant to this section...in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(i)(2); *Shore*, 381 F.3d at 198-199. The aggrieved parent(s) may thus bring a cause of action based on the same complaint they brought before an administrative court concerning, for example, the district's determination or procedure utilized, receiving a "modified de novo" review based on the administrative record plus any additional evidence adduced before the court. *See, e.g., Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757-758 (3d Cir. 1995); *see also* 20 U.S.C. § 1415(i)(2)(C).

## II.   PROCEDURAL BACKGROUND AND PARTIES' CONTENTIONS

### A. Procedural Background

In the spring of 2007, B.M. was in the second grade. Sparta, at the request of B.M.'s teacher, developed an Intervention and Referral Services Program ("I&RS") for B.M., because his progress in reading, math, and writing was falling short of his potential.[3] (First Amended Complaint ("FAC") at ¶ 10). B.M.'s teacher, however, informed Sparta that B.M.'s progress remained unsatisfactory. (*Id.* at ¶11). Thus, in June 2007, Sparta commenced an evaluation of B.M.'s eligibility for special education and related services. In September 2007, it found him eligible for special education. Specifically, Sparta found him "Eligible for Speech and Language Services" due to "decoding and encoding issues." (*Id.* at ¶ 19). Sparta provided B.M. special speech and language services, pursuant to an individualized education plan (IEP), through third and most of the fourth grade. (*Id.* at ¶26).

In 2009, the period on which this case focuses, B.M. was 10 years old, a fourth grader in the Sparta public school system. It is alleged that he then had disorders in reading, written expression, and mathematics, and has been diagnosed with dyslexia and attention deficit hyperactivity disorder. (*Id.* at ¶¶ 5-6).

---

[3] An I&RS program provides extra services to the student, but is not considered special education.

I particularly note that these disorders in attention or processing do not imply a lack of mental capacity. B.M. "is very bright and has the potential to make progress educationally commensurate [with] his grade and age level." (*Id.* at ¶ 9).

In the spring of 2009, Sparta reevaluated B.M. (*Id.* at ¶ 50). In July 2009, Sparta removed B.M.'s classification, finding him to be no longer "Eligible for Speech and Language Services." (*Id.* at ¶ 65). It also determined that he was not "Specific Learning Disabled" or "Other Health Impaired." (*Id.* ). Sparta acknowledged B.M.'s learning issues, however; it undertook to address those issues through an I&RS program rather than through special education. (*Id.* at ¶ 66). This lawsuit focuses on the bases for Sparta's determination that B.M. was not "Specific Learning Disabled" as of July 2009.

Following that determination, V.M. filed a petition against Sparta with the New Jersey Department of Education's Office of Special Education Programs. (*Id.* at ¶ 85). As of November 2009, having failed to persuade Sparta to reconsider its non-eligibility determination, V.M. enrolled B.M. in The Craig School, a private school for children with learning disabilities. (*Id.* at ¶ 79).

After a failed attempt to resolve V.M.'s petition in mediation, the Office of Special Education transmitted V.M.'s administrative action to the New Jersey Office of Administrative Law. (*Id.* at ¶ 86). There, Administrative Law Judge (ALJ) Barry E. Moscowitz conducted an evidentiary hearing on eight days in 2010. On November 16, 2011, Judge Moscowitz issued a final decision in favor of Sparta. (Final Decision of ALJ, 2011 WL 6013465 (N.J. Adm.)).

V.M. filed this action on February 14, 2012, and amended her Complaint on May 18, 2012. V.M. demands a judgment: (1) compelling Sparta to find B.M. eligible for special education, (2) compelling Sparta to reimburse all of the costs incurred to place B.M. at the Craig School, (3) awarding B.M. "compensatory education," (4) compelling Sparta to prospectively fund all of the costs of B.M. remaining at the Craig School, and (5) compelling Sparta to prepare an IEP which stated that B.M.'s now-current educational placement is at the Craig School. (*See* Complaint, Doc. No. 1 at p. 20).

The parties agreed to proceed without discovery, and set a date by which they would file motions for summary judgment. (*See* Fourth Consent Order Amending Pretrial Scheduling Order [ECF No. 24]). On December 13, 2012, Sparta moved and V.M. cross-moved for summary judgment. [ECF Nos. 25-26]. Each motion has since been fully briefed, with comprehensive references to the parties' joint appendix [ECF No. 13] containing a transcript of the administrative hearing and all of the documents constituting the administrative record. Finally, on March 12, 2014, I convened oral argument on the pending motions. [ECF No. 33].

## B. The Parties' Contentions In These Summary Judgment Motions

V.M. argues that the evidence adduced before the ALJ demonstrates that, in determining that B.M. was not eligible as "Specific Learning Disabled," Sparta impermissibly relied solely on a statistical formula. Although that procedure complied with Sparta's local policy, it allegedly did not comply with the overriding mandate of IDEA and its implementing regulations. According to V.M., this shortcoming, overlooked by the ALJ, constitutes a violation of the IDEA. (FAC at ¶ 95; Br. Supp. Mot. Summ. J. at 34, 37-38). Relatedly, V.M. contends that Sparta's 2009 evaluation did not include a formal classroom evaluation (Pltf's Statement of Material Facts ("SMF") at ¶ 13), and that Sparta does not consider teacher observations about a child or other indicia of classroom performance for purposes of determining eligibility (id. at ¶¶ 14-15).[4]

Not so, says Sparta. Far from confining itself to a mathematical formula, it "used multiple assessment measures within its severe discrepancy model, multiple forms of B.M.'s functional performance as well as verbal and written input from B.M.'s teachers, IEP team members, V.M.'s experts and even V.M. herself when it determined whether B.M. was eligible for services under the classification category of SLD." (Def.'s Br. Opp. Pltf's Mot. Summ. J. at 8-9); The 2009 evaluation, Sparta contends, did include classroom observation—as part of Lucille Anderson's educational assessment (Resp. to Pltf's SMF at ¶ 13); this was, it says, a "gauge [of] performance" by B.M.'s classroom teacher (id. at ¶ 15). Sparta thus argues that it did not violate IDEA and regulations.

## III.   THE ADMINISTRATIVE HEARING

Most critical to the Court's resolution of these motions is an examination of the record created before the ALJ. The ALJ conducted a hearing over eight non-consecutive days in April through September, 2010, to determine the following issue: "Should B.M. have been classified as having a specific learning disability (SLD)?" (ALJ Opinion, 2011 WL 6013465 at Statement of the Case). The ALJ determined: "No. In Sparta, an SLD is determined when, among other factors, a minimum of 1.5 standard deviations exist between achievement and ability." (Id.). At the hearing, testimony was heard from some 14 witnesses, including Sparta employees who worked on B.M.'s case, experts, and V.M. herself.

_____

[4] V.M., in its briefing, also argues that Sparta impermissibly failed to conduct a classroom observation (see Br. Supp. Pltf.'s Mot. for Summ. J. at p. 39); that it improperly relied on unreliable indicia of V.M.'s intelligence (see id. at 40-44); that it should have found B.M. to be eligible as "Other Health Impaired" (see id. at 44-45); and that it should have developed a "504 plan" (referring to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794) (see id. at 45-47).

## A. The CST Investigation

At the administrative hearing, it was established that Sparta's CST commenced a reevaluation of B.M. on or around May 4, 2009. (*See id.* at Findings of Fact, Part II at Fourth Grade, Section B). CST members thereafter conducted a new social assessment, speech and language assessment, educational evaluation, occupational therapy evaluation, and neurological evaluation. The ALJ's opinion summarizes each of these evaluations. (*See id.* at Sections B-C). Many of the witnesses, particularly those who were CST members, discussed the assessments in depth in their testimony, pertinent aspects of which are set forth in section III.C, *infra*.

## B. Sparta's Eligibility Determination Report for B.M.

The CST's evaluation was followed by a July 2, 2009 eligibility meeting, at which Sparta's IEP Team decided whether B.M. should be classified as having any type of disability. (*See id.* at Section D). Indeed, as set forth *supra* at Section II.B, a school district, upon completion of its CST's evaluation, is to convene its Eligibility Meeting Participants (which Sparta apparently refers to as its "IEP Team") to determine he pupil's eligibility and document that determination in a written report. *See* N.J.A.C. § 6A:14-3.5(a). Sparta thus proceeded to this second step in the two-step determination process, its CST giving way to its IEP team.[5] I note that some individuals served on both teams.

Sparta's IEP team consisted of Linda Cooper (Sparta's Director of Special Services), Lorise Goeke (Principal of Helen Morgan School), Meghan Marencik (Sparta's Occupational Therapist), Cheryl O'Keefe (School Psychologist appearing a representative of Sparta), Susan Lorentz (a second School Psychologist also appearing as a representative of Sparta), Judy Hart (the CST Case Manager), Lucille Anderson (as Child Study Team member), Margaret Milligan (a special education teacher), D. Smulewicz (a general education teacher), and C. Mangiaracina (a social worker). (Eligibility Meeting Participants' Sign-In, Ex. R-19 at Ja436-437). Sparta's district counsel, Rodney Hara, was also present at the Eligibility Meeting, while V.M. and her attorney did not exercise their right to attend. (*Id.*).

The IEP prepared its "Eligibility Determination Report" for B.M.. Such a report is required. It must state the district's reasoning for a finding that a pupil is or is not eligible for special education. *See* N.J.A.C. § 6A:14-3.4(h)(1)-(4); *supra* at I.B.1. The report concerning B.M. has two sections—first, a lengthy "Collaborative Evaluation Summary," and second, a brief "Statement of Eligibility." (*See* Report, Ex. R-19 at Ja438-41).

---

[5] The ALJ's opinion stated that the *CST* met and determined eligibility (*see* discussion *infra* at IV.C.3). The ALJ seems to have intended to refer to the IEP Team.

The "Collaborative Evaluation Summary" describes the various observations and test results of the CST members who analyzed B.M. In evaluating B.M., it appears that the team members gathered a variety of data. The Summary includes observations from a psychological evaluation, achievement tests, and a social assessment, in addition to teacher input. (*Id.* at Ja438).

The "Statement of Eligibility" section of the Report comprises a single paragraph. It states:

> The IEP team met and has concluded that [B.M.] does not meet eligibility requirements for special education and related services at this time. Consideration was given to the following classification categories: Communication Impaired, Specific Learning Disability, Eligible for Speech-Language Services, and Other Health Impaired. [B.M.] does not meet criteria for Communication Impaired. [B.M.]'s speech-language testing is currently consistent with the language testing of one year ago, with receptive and expressive language scores generally within the average range. There are not two measures below 1.5 standard deviations, or the 10%ile. **[B.M.] does not meet criteria for specific learning disability because there is not a severe discrepancy between current achievement and intellectual abilities in one or more of the prescribed areas.** [B.M.] does not meet criteria for Other Health Impaired because he has not been medically diagnosed by Dr. Patel with a chronic or acute health problem, which requires special education and related services. [B.M.] no longer meets eligibility criteria for speech-language services due to significant progress in phonemic areas that place him above the 10%ile on formal measures. The CST recognizes that working memory and organizational issues are concerns for [B.M.]'s education success, and that those issues can be addressed through regular education channels. Referral to general education I&RS committee is recommended.

(*Id.* at Ja440-41 (emphasis added)). This terse eligibility determination does not state that the team's decision is based on anything other than the formula. (*See id.*).

The ALJ, properly in my view, did not take this short statement at face value. He permitted the parties to develop the record concerning the underlying basis for the Eligibility Determination, and the method for arriving at it.

## C. Testimony of Sparta Officials Before the ALJ

### 1. *Judy Hart, CST Case Manager*

Judy Hart, a speech language specialist employed by Sparta, was the case manager on B.M.'s eligibility determination. She participated in the July 2, 2009 eligibility meeting. (*Id.*).

On direct examination, Hart made it clear that the participants in the eligibility conference used the severe discrepancy model in determining whether B.M. had a SLD.[6] (Ja708-10). That severe discrepancy model, she said, constitutes the "eligibility criteria for specific learning disability." (Ja709). In response to a question by Judge Moscowitz, she stated that the IEP's decision was consistent with the Sparta Procedure. (Ja808-809). Hart described how the district's statistical formula works. One input is the student's IQ score. (For B.M., Sparta ran the formula using two different IQ scores obtained by Dr. Kristin Sharma: B.M.'s December 2008 "full score IQ,"[7] and B.M.'s "general abilities index [GAI][8] IQ" scores). The other input is the student's achievement score from the Woodcock-Johnson test. (Ja806). These scores are meant to illustrate a student's aptitude and a student's actual achievement, so that the discrepancy between them may be analyzed. (*Id.*). No combination of B.M.'s scores rendered him eligible under the statistical severe discrepancy formula. Oddly, however, the IEP did not report any of the scores in its Eligibility Determination Report. (Ja785, 810).

On cross-examination, Hart was asked about the Eligibility Determination Report. The Collaborative Evaluation Summary section of the Report, she testified, contained summaries of each CST member's evaluation of B.M., including evaluations by multiple teachers. (Ja783). The Statement of Eligibility section, she confirmed, reflects that the severe discrepancy formula was the only basis for Sparta's determination of eligibility. (Ja 784-786).

---

[6] As opposed to the other methodology permitted by law: the "response to intervention methodology." *See* N.J.A.C. §§ 6A:14-3.5(c)(12)(ii); 6A:14-3.4(h)(6); *infra* at III.B., n.7.

[7] Dr. Sharma, however, advised Sparta that the FSIQ score she obtained was unreliable and should not be used. (Ja174-175; Ja807; *see also* Ja176).

[8] The GAI is an aptitude indicator with a different number system that can be used in lieu of IQ scores. (*E.g.*, Testimony of Lorentz, Ja1004).

Hart was also probed about how a student's achievement score is obtained. The Woodcock-Johnson achievement score, she explained, is a composite score blending the results of a variety of tests on different subject matters. Thus a student may be very weak in certain subjects, but if he does well enough in other subjects, his poorer scores may have no independent significance in the discrepancy analysis. (*See* Ja794-96).

Overall, Hart's testimony indicates that Sparta, in determining B.M.'s eligibility, based its SLD classification decision solely on whether there was a sufficient statistical discrepancy between achievement and aptitude, according to a set formula.

### 2. Lucille Anderson, CST member

Lucille Anderson, a learning consultant for Sparta, was a member of the CST who participated in the July 2009 eligibility meeting. (*See* Eligibility Meeting Participants, Ex. R-19 at Ja436). She testified before the ALJ that in June 2009, around the time that B.M. completed the fourth grade, she conducted and summarized in writing an educational evaluation of B.M. That evaluation included classroom observations, review of records, informal assessments, and the Woodcock-Johnson III ("W-J III") tests of achievement. (*See* Testimony of Anderson, Ja860-878; Educational Evaluation, Exhibit R-28, Ja506-520).

Anderson described her in-class observation and informal assessment, (Ja881-882), as well as her evaluative conclusions about B.M. (Ja883-886). She reviewed certain "records"—report cards and certain other documents—but conceded that she did not address them in her written evaluation. (Ja903). She stated that she reviewed those records "just to get a feel for where the student is and where they're—you know, a basic understanding of what the teacher's concerns are." (Ja904). She explained that she did not discuss B.M.'s records in her written evaluation because such records "do[] not equate to any eligibility. The report that I write is written for the sole purposes of eligibility for services." (*Id.*; *see also* Ja929-930 ("[Report cards] give[] you a global idea of where the teacher is seeing a weakness…It's not [relevant] in some respects because the educational evaluation is to determine the eligibility. So, a core of tests needs to be given to meet the code…Any information beyond eligibility would just be to assist the teacher"). Her written evaluation dealt solely with the results of the W-J III tests.

Similarly, on cross examination Anderson admitted:

> Q.    …did you note your classroom observation anywhere in this report?
> A.    I did not.

13

(Ja907). She conceded that her "general impressions" of B.M. were not a factor in determining eligibility. (Ja938). Overall, then, Anderson's testimony indicates that B.M.'s achievement test scores were the only portion of her evaluation that mattered for purposes of determining B.M.'s eligibility.

### 3. Susan Lorentz, Eligibility Meeting Participant

Susan Lorentz, Sparta's school psychologist, participated in the July 2009 eligibility meeting as a representative of the school. (*See* Eligibility Meeting Participants, Ex. R-19 at Ja436).

Lorentz conducted a psychological reevaluation of B.M. in June 2009. The results were reported as part of the Collaborative Evaluation Summary of the Eligibility Determination Report. (Exhibit R-19 at Ja438). She gathered information from teachers, parents, and B.M., and administered a Full Scale IQ test called WISC-IV. (Ja980). She also completed a social/emotional assessment using information gathered from an interview with B.M., (Ja990-991), but did not observe him in class (Ja1070).

Like others, Lorentz testified that Sparta used a statistical significant discrepancy model to determine SLD eligibility, "looking just for one and a half standard deviations—a one and a half standard deviation difference between their ability and their achievement, aptitude and achievement[.]" (Ja1006). She clarified that, at the time of the eligibility meeting, Dr. Sharma's IQ testing results (the most recent available) were used to represent B.M.'s aptitude, while Lucille Anderson's June 2009 educational assessment was used to represent B.M.'s achievement. (Ja1009). She further explained that the same result—no significant discrepancy—occurred when she substituted the FSIQ scores that she obtained in place of Sharma's, regardless of whether she converted the score to the alternative GAI system (*see* n.8, *supra*). (Ja1015-16).

Lorentz also testified that she administered a rating survey to teachers and parents called the Connors Rating Scale, to obtain data on whether the child is "struggling with oppositional behaviors" or whether "there are concerns about inattentiveness, hyperactivity, or the presence of ADHD." (Ja1025). She obtained further teacher input through a Social Skills Rating System (Ja1030). She testified, however, that the CST would not find an SLD on the basis of the responses to these survey questions (even when those responses indicated that B.M. was in the bottom ten percent of his class certain categories), because a teacher's expectations, tolerance, and class composition would affect such responses. By contrast, she stated, IQ and test scores represented "hard analysis of information." (Ja1036-37).

Lorentz at one point appeared to assert that her discussions with teachers and the results of the Connors Teaching Rating scale were taken into

account when determining eligibility. (Ja1055-1058). She immediately clarified, however, that these survey results affected only her psychological *assessment* of B.M., not the actual eligibility determination. (Ja1058 ("These responses were part of the – yes. They're part of the psychological assessment[.]"). She continued:

> Q.   Okay. So this – so this was part of the psychological assessment?
>
> A.   Yes.
>
> Q.   Okay. And this was not taken – this was not part of determining the IQ or the GAI. Is that correct?
>
> A.   They're difference measures. The IQ scores, the ASK and the [WISC] and these are self-reporter questionnaire measures.
>
> Q.   Okay. If you're only using the full scale IQ or the GAI in determining eligibility as part of the discrepancy model, what significance does the Connors assessment have on – in determining eligibility for special education and related services?
>
> A.   It gives us another source of information about a student but it can't be applied to a comparison of education functioning and – and IQ functioning.
>
> Q.   Okay. But if you're only using a discrepancy model, why would– what– what is the significance of these questions? Why would you have – why would you need another look to determine educational functioning?
>
> A.   It gives – helps us to better understand how that student is in – in the school environment or in the home environment.
>
> Q.   Do these answers impact your – your determination as far as determining eligibility?
>
> A.   They help us get a better understanding of the student.
>
> Q.   So do they – but **do they help determine whether the student will be eligible for special education and related services?**
>
> **A.   Not in terms of that discrepancy formula.**
>
> ...
>
> Q.   I asked you – **does this play into the determination in any way for determining whether a student would be eligible for special education and related services?**
>
> A.   It just gives us–
>
> **Q.   Yes or no.**
>
> **A.   -- No.**

(Ja1059-1060 (emphasis added)).

Thus, Lorentz's testimony reveals that Sparta's *evaluations* and *assessments* were broad and multidisciplinary, and that the CST gathered and

15

considered a broad array of information. The IEP's *determination* not to classify B.M. as being SLD, however, was based only on the IQ scores and achievement test results, which went into the severe discrepancy formula. (*See id.*).

### 4. *Cheryl O'Keefe, Eligibility Meeting Participant*

Cheryl O'Keefe is a school psychologist employed by Sparta. She became familiar with B.M. in 2009, and although she did not evaluate him (Ja1098-1099), she attended the eligibility conference as a representative of the school. She expressed her agreement with the non-eligibility determination. (Ja1100; Eligibility Meeting Participants, R-19, Ja437).

On direct examination, O'Keefe testified that Sparta had a "chart [R-38] that was developed and used for comparing scores to determine eligibility—standard scores." (Ja1143-1144). The chart was a shorthand way for understanding what combinations of full scale IQ scores and WISC-IV achievement scores had enough of a significant discrepancy between them to trigger special education eligibility. O'Keefe defended Sparta's test-based approach to generating formula input, contrasting this data with "subjective measures" such as teacher observations, which it does not utilize to determine eligibility. (Ja1144-1146 ("We would need much more definitive information and that's provided in those standard scores and in the standardized testing.")). She specifically characterized one teacher's assessment of B.M.'s in-class performance (Exhibit P-10) as "simply her subjective opinion of where he may have fallen in her class and not having any information about the make-up of that class, it simply tells us that based on her particular class, he was probably falling within the normal distribution of students [on] the lower end." (Ja1145).

O'Keefe, on cross examination, affirmed Lorentz's testimony, as follows:

> Q.  Are you familiar with the federal regulations regarding determination of eligibility that require as part of determine—determination of eligibility that the team draw upon information from a variety of sources including aptitude and achievement tests, parent input and teacher recommendations as well as information about a child's physical condition, social, cultural, background and adaptive behavior?
>
> A.  Yes.
>
> Q.  And—but you are only taking information from the standardized test scores. Is that correct?
>
> A.  We—we review all of that in the course of our evaluations.
>
> Q.  Right. But a moment ago you testified that you only rely on the standardized test scores.

16

> A. We relied on the standardized test scores to determine the severe discrepancy. Yes.
>
> Q. Okay. Which is your basis for determining whether a child is eligible or not eligible?
>
> A. In this case, yes.

(Ja1153-1154). Thus, yet another eligibility meeting participant acknowledged that the eligibility determination was based on the standardized test scores input into the severe discrepancy formula. (*See id.*).

### 5. Linda Cooper, Eligibility Meeting Participant

Sparta's director of special services, Linda Cooper, also participated at the eligibility meeting (Eligibility Meeting Participants, R-19, Ja436). Like others, she too testified that, as per the district's policy (*see* Ja1185), "severe discrepancy is the procedure utilized to identify a student in the category of specific learning disability[,]" and "[to] measure significant discrepancy the child study team for the Sparta Public School District will implement statistically sound formula of a minimum of one and a half, 1.5 standard deviations for all students grades K through 12. For example, a minimum difference of 22 standard score points between achievement and aptitude." (Ja1177).

Cooper's testimony on cross-examination further revealed a distinction between the *evaluation* process and the *determination* meeting. Like Lorentz, Cooper stated that the CST conducts evaluations of functional performance in the classroom simply because "you know, you want to always, you know, look at the comprehensive picture of a student including functional [performance]." (Ja1211). She continued:

> Q. Is that used in determining eligibility for SLD?
>
> A. It's part of the evaluation process. **However, there is, you know, specific criteria for determining SLD in addition to that.**
>
> Q. If the specific criteria in determining eligibility for SLD, why would an observation be necessary?
>
> A. An observation is required according to the code. One members of the child study team has to observe a student in the classroom.
>
> Q. Why is that – why do you think that is part of the code in determining eligibility for specific learning disability.
>
> A. So you could see how the child functions in the classroom.

17

Q.    So if a child functions poorly in the classroom, but doesn't meet the code criteria – the discrepancy model for SLD, what relation does that have in determining eligibility?

A.    Well, of course you would use any of the information that you gather from your observation, from your meetings with the teachers, you know, report cards, work samples, progress reports and then if the child is determined not to be eligible, all of that information would be utilized when the I[&]RS meeting takes place and it would be utilized to formulate an action plan.

Q.    Right. Under the discrepancy formula you just use basically numbers from the educational assessment and the psychological assessment, don't you?

A.    **Well, that's how you determine if a child is eligible for SLD, but there are other factors that go into the comprehensive evaluation, which I just described.**

Q.    So it doesn't—it's not used in determining eligibility for SLD, is it?

A.    It's part of the evaluation process. In other words, you just wouldn't take a child and test him and that would be all you would do to make a determination if a child is eligible for special education and related services in any category.

Q.    So is it your testimony that it is relevant in determining eligibility for SLD?

A.    It's relevant in the evaluation process.

Q.    Including SLD?

A.    Well, that would be part of the process that you would go through to evaluation – when you evaluated any child. You don't know—before you start the evaluation you're not just looking, oh, is this child going to be eligible as SLD.  You want to see is the child eligible for special education and related services.

Q.    **In determining eligibility for SLD what is it – the district's – it's your testimony that the district only relies on the discrepancy formula?**

A.    **That is – you know, that is what we use for the determination and that is – we are authorized to use that according to the code.**

Q.    **So your answer is yes?**

A.    **Yes.**

18

(Ja1212-1214 (emphasis added)).

In sum, then, Cooper testified that the functional assessments (including classroom observation) matter for evaluative purposes. She backed down, however, from an assertion that those functional assessments also matter for purposes of eligibility. She acknowledged that Sparta employs only the discrepancy formula for determining eligibility under SLD.

### 6.   Pamela Steel, Sparta's Learning Consultant

Sparta's learning consultant, Pamela Steel, also testified at the administrative proceeding. Although she did not participate in the eligibility determination meeting, Steel is familiar with district policies and reviewed B.M.'s evaluations. (*See* Ja1660-1661). Her testimony confirmed the testimony of the witnesses who preceded her:

> A.   I have not reviewed the material to come to that determination [that B.M has dyslexia], but that [dyslexia] does not qualify you for special education services.
>
> Q.   So what does?
>
> A.   You need to have the discrepancy between your intellectual ability and your achievement[.]
>
> Q.   And no other factors are considered in determining eligibility?
>
> A.   That's—that's the basis of finding a specific learning disability.
>
> Q.   So this is your answer[,] "no?" No other factors are determined—are used?
>
> A.   I'm sorry. I don't –
>
> Q.   Do – do you rely –
>
> A.   – understand –
>
> **Q.   Just do you rely upon any other factors other than discrepancy to determine with a child is eligible for – under SLD?**
>
> **A.   Not under SLD.**

(Ja1663-1664 (emphasis added)).

### D. The ALJ's Findings and Decision

The ALJ's decision affirmed that of Sparta. The trouble is that it did so based on the same erroneous standard upon which Sparta based its decision: namely, that a SLD cannot be found unless a minimum of 1.5 standard

deviations exist between achievement and ability pursuant to a particular statistical formula. Here is the ALJ's statement of his holding at the beginning of his decision:

> Although B.M. had an imperfect ability in reading, writing, and arithmetic, a minimum of 1.5 standard deviations did not exist between achievement and ability. Should B.M. have been classified as having a specific learning disability (SLD)? No. In Sparta, an SLD is determined when, among other factors, a minimum of 1.5 standard deviations exist between achievement and ability.

(ALJ Opinion, 2011 WL 6013465 at *1)

The ALJ found that "the CST reviewed Sparta's documented procedure for making such a determination," and "Sparta's documented procedure for determining SLD includes a statistical formula, which requires a minimum of 1.5 standard deviations, or a minimum of 22 standard score points, between achievement and aptitude." (Opinion, 2011 WL 6013465 at Findings of Fact.V (citing R-24, Ja 483-484)). He directly quoted the procedure, which states: "To measure 'significant discrepancy' the Child Study Team for the Sparta Public School District will implement statistically sound formula of a minimum of one and one half (1.5) standard deviations for all students grade K-12, i.e., a minimum difference of 22 standard score points between achievement and aptitude." (Id.). And he further states: "Students who are performing poorly in school may not be identified as learning disabled if the amount of discrepancy between aptitude and achievement is not significant." (Id.).

Further, the ALJ found that Lorentz, utilizing the FSIQ results obtained by Sharma in 2008 and the WJ-III scores obtained by Anderson in 2009, "determined that no significant discrepancy existed between the achievement (as measured by the WJ-III scores) and aptitude (as measured by the FSIQ) in any of the enumerated areas for SLD...In other words, a minimum of 1.5 standard deviations (or a minimum of 22 standard score points) did not exist between achievement and aptitude." (Id.).[9]

The ALJ's findings of fact do not indicate that Sparta used anything other than the results of the severe discrepancy formula to make its eligibility determination. (See id.)

In setting forth his conclusions of law, the ALJ, after again noting the failure to satisfy the 1.5 standard deviations formula, stated, without reference, that "In addition to [B.M.'s] current achievement and academic ability scores, the CST considered his report cards, classroom work, and teacher evaluations.

---

[9] And he found, as Lorentz testified, that there was no severe discrepancy even when Lorentz used the General Abilities Index (GAI) as an aptitude indicator in lieu of the allegedly unreliable FSIQ.

..Similarly, the CST relied on the private evaluations and the feedback from his parents." (*Id.* at Concl. Of Law, II.C.). I emphasize that this conclusion speaks only to what the CST considered in its evaluation. It does not state that Sparta's IEP based its eligibility determination on these factors.

The ALJ, like Sparta, did ultimately "CONCLUDE that B.M. was ineligible for special education and related services under the classification of SLD." (*Id.*).

## IV.   LEGAL DISCUSSION

I find that all or virtually all of ALJ Moscowitz's factual findings are well supported by the administrative record. And it appears that the ALJ was on solid ground in finding that the IEP's decision complied with Sparta's procedure for determinations. The dispute here, however, concerns *how* Sparta's IEP team arrived at its determination, and whether Sparta's procedures themselves comport with the law. That issue was not addressed by the ALJ.

For the reasons set forth below, I find that the evidence overwhelmingly establishes that Sparta's IEP impermissibly relied solely upon a single statistical formula to arrive at its determination that B.M. was not eligible for SLD classification.

### A. Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and

pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254 (1986).

In this case, the summary judgment standard must be viewed in the context of what is effectively an appeal of an administrative decision. In such a proceeding, a district court is to make its own findings using a "preponderance of the evidence" standard, while affording "due weight" to the ALJ's determinations. The "factual findings from the administrative proceedings are to be considered prima facie correct," but the district court may reject them and make contrary findings as long as it explains its reasons. *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003); *see also Susan N.*, 70 F.3d 751, 757 (discussing the "modified de novo" standard, which is atypical of judicial review of agency decisions). Where, as here, "the District Court does not hear additional evidence[,] it must find support for any factual conclusions contrary to the ALJ's in the record before it [and] explain why it does not accept the ALJ's findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." *Id.*[10]

I thus accept the factual findings of ALJ Moscowitz, unless I state otherwise. V.M.'s case, however, is primarily about a matter as to which Judge Moscowitz did not make a finding: that Sparta violated the procedural requirements of the IDEA.

## B. Whether an SLD Determination May be Based Solely on the Statistical Discrepancy Formula

The threshold legal issue is whether, as Plaintiff claims, it is an error for a school district to base an eligibility determination solely on the statistical discrepancy test, as mandated by Sparta's own procedure. In this section, I conclude that V.M. is correct; to do so is a deviation from the proper procedure prescribed by IDEA and the regulations thereunder. In the following section, I consider whether such a violation occurred in this case.

---

[10] I note that where a district court makes any contrary conclusions regarding witness credibility (which is not an issue here), it must explain and justify its findings with references to extrinsic, non-testimonial evidence in the record. *Shore,* 381 F.3d at 199 (reversing district court order overturning ALJ because district court incorrectly and without justification credited certain witnesses while discrediting others) (citing *Holmes v. Millcreek Twp.*, 205 F. 3d 583, 591 (3d Cir. 2000)).

The question presented has been addressed in this District. In *M.B. and K.H. o/b/o J.B. v. S. Orange/Maplewood Bd. of Ed.*, 2010 WL 3035494 (D.N.J. Aug. 3, 2010) (Chesler, D.J.), the Court found that the applicable state and federal regulations "appear to clarify that even when using a severe discrepancy method for identifying specific learning disability, a school district may not look exclusively to numerical assessments of a child to make its determination. *Id.* at \*8. There, Judge Chesler rejected the ALJ's finding that the district considered a variety of factors in declassifying a student, finding instead that the district relied solely on results of a computerized calculation to arrive at its ineligibility determination. *Id.* He added, "the law is clear that determining whether a child is disabled under the IDEA must be based on more than a formula-driven numerical assessment of a child." *Id.*

In *M.B.*, a child found eligible as SLD in the first grade was reevaluated and found ineligible in the fourth grade. The school district hired an outside expert (the same expert who had previously evaluated the child) to reevaluate the student. The expert performed a battery of tests, including FSIQ and Weschler Intelligence Scale IV, as well as Woodcock-Johnson III. The school district then took the student's scores from a portion of her FSIQ (representing aptitude) and a portion of her W-J III test (representing achievement) and inputted them to a computer program which used a regression analysis to determine if there was a severe discrepancy between aptitude and achievement. The computer program found no severe discrepancy. *Id.* at \*3-4. The results of this analysis constituted the School District's sole stated basis for not finding eligibility. Accordingly, Judge Chesler found a procedural violation of IDEA. *Id.* at \*8. *See also C.B. o/b/o of M.B. v. W. Orange Bd. of Ed.*, 2000 N.J. Agen LEXIS 390 (OAL April 19, 2000) (finding, without discourse on legal requirements, that school board's eligibility determination was "essentially formula-driven," meriting an order reversing board's declassification).

In forming his legal conclusions, Judge Chesler reasoned that both federal regulations, 34 C.F.R. § 300.304(b)(1)-(2), and state regulations, N.J.A.C. § 6A:14-2.5(a)(1)-(2), prohibit the use of any single measure for determining whether a child has a disability. He also reasoned that N.J.A.C. § 6A:14-3.5(c)(12)(iv), though requiring school districts to utilize a formula to determine whether there is a severe discrepancy, *also* requires districts to assess the child's academic achievement and ability. *M.B.,* 2010 WL 3035494 at \*8.

In addition, Judge Chesler found that certain Policy Letters of the Department of Education's Office of Special Education and Rehabilitative Services "confirm that a school district may not rely on any single procedure...as the sole basis for determining that a child has or does not have a qualifying disability under the IDEA." *Id.* Such policy letters are not binding statements of the law, but may be persuasive. *See Ringwood Bd. of Educ. v. K.H.J.*, 469 F. Supp. 2d 267, 270 (D.N.J. 2006) ("OSEP is an agency that exists

to administer the IDEA. The amount of deference given to administrative interpretations depends on their persuasiveness. To evaluate persuasiveness, courts should consider such factors as 'thoroughness, reasoning, and consistency with other agency pronouncements.'" (internal citation omitted)).

Here, Plaintiff cites four such letters. The *Letter to Dr. Perry A. Zirkel,* dated March 6, 2007, affirms that under both 34 C.F.R. § 300.304(b)(1)-(2) *and* the IDEA itself at 20 U.S.C. § 1414(b)(2)(A)-(B), "an evaluation of a child suspected of having a disability, *including a specific learning disability,* must include a variety of assessment tools and strategies and cannot rely on any single procedure as the *sole criterion for determining eligibility for special education*[.]" (Italics added for emphasis). Another letter, the *Letter to Buck Gwyn, Esq.,* also dated March 6, 2007, makes clear, through citation to 34 C.F.R. § 300.304(b), that state regulations governing the procedure for classifying a student as SLD "must include a variety of assessment tools and strategies and may not use any single measure of assessment as the *sole criterion for determining whether a child is a child with a disability.*" (Italics added for emphasis). Yet another letter, the *Letter to Aurelio Prifitera, Ph.D.,* dated March 1, 2007, adds that "information from discrepancy [or any other] procedure [for determining SLD classification] is just one component of an overall comprehensive evaluation of a child suspected of having a disability." Finally, the *Letter to Dr. Perry A. Zirkel,* dated August 15, 2007, states that school districts' option of using "any combination" of the available "options/models"[11] for determining SLD classification, these are only "part of a comprehensive evaluation under 34 C.F.R. §§ 300.301-300.311 to determine the presence of a specific learning disability."

The first *Letter to Zirkel* and the *Letter to Gwyn* are significant. The former points out that the IDEA statute itself, 20 U.S.C. § 1414(b)(2)(B), prohibits a district from relying on "any single measure or assessment as the sole criteria for determining whether a child is a child with a disability[.]" And both letters cite, as Judge Chesler did, the equivalent, companion requirement contained in 34 C.F.R. § 300.304(b)(2).

Thus the IDEA, as well as its federal and New Jersey implementing regulations, state that a district may "not use any single measure or assessment," or "single procedure," "as the sole criterion for determining whether a child is a child with a disability." 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2); N.J.A.C. § 6A:14-2.5(a)(2). These provisions encompass all disability eligibility determinations; naturally, then, they apply to a district's determination concerning potential SLD eligibility. Although each of these provisions exists within a subsection entitled "Evaluation Procedures," *see, e.g.,* 20 U.S.C. § 1414(b), their plain text (and context) reveal that they control the final step of the evaluation—the *determination*—in which designated meeting participants decide, on a district's behalf, whether a child should be

---

[11] New Jersey offers two options. N.J.A.C. § 6A:14-3.5(c)(12)(i)-(ii).

classified as having some form of disability. On balance, then, I align with the Department of Education and Judge Chesler, who have both cited these provisions in finding that SLD determinations must be based on a wide range of data— and not on any single measure.

Other regulatory provisions cited in *M.B.* appear to be less relevant. Judge Chesler cited N.J.A.C. § 6A:14-2.5(a)(1), which requires school districts, in their evaluations, to "use a variety of assessment tools and strategies to gather relevant functional and development information, including information [] provided by the parents that may assist in determining whether the child is a student with a disability." *Id.* at § 6A:14-2.5(a)(1). Judge Chesler, like the Department of Education in its first *Letter to Zirkel*,[12] also quoted a portion of the substantially equivalent federal regulation, 34 C.F.R. § 300.304(b)(1). These provisions very clearly govern the *evaluation* process, that is, the process in which the CST "gather[s] relevant...information." *Id.* Nonetheless, they make it clear that the district has much more than test scores and formula results at its disposal. Reviewing the regulatory scheme as a whole, I conclude that districts are supposed to gather a wide array of data *and actually use* such data in their decision making. It makes perfect sense that the school authorities, having been required to collect all this information, should also be required to *use* it in its decision making.

Any lingering doubts are resolved by two other regulatory provisions not cited by Judge Chesler or the Department of Education.

First, 34 C.F.R. § 300.306(c)(1) provides that "in interpreting evaluation data for the purpose of determining if a child is a child with a disability[,'] the "public agency *must [d]raw upon* information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior[,]" and must "ensure that information obtained from *all of these sources* is documented and carefully considered." (Emphasis added). This provision is found in a section entitled "Determination of Eligibility" and subsection entitled "Procedures for determining eligibility and educational need." *Id.*

Additionally, N.J.A.C. § 6A:14-3.5(c) provides that "[c]lassification shall be based on <u>all assessments conducted</u> including assessment by child study team members and assessment by other specialists as specified below." This provision is located in a section entitled "Determination of eligibility for special education and related services," and in a subsection outlining the fourteen disability classifications entitling a student to special education and related services. *Id.*

---

[12] The Department of Education, in its first *Letter to Zirkel*, also cited the equivalent provision in the IDEA itself, 20 U.S.C. § 1414(b)(2)(A).

Thus, when determining whether a student like B.M. should be classified as having a SLD, or any other type of disability, Sparta "must [d]raw upon information from a variety of sources," 34 C.F.R. § 300.306(c)(1), "document[] and carefully consider[]" such information, *id.*, and, because it is subject to New Jersey law, its "[c]lassification [determination] shall be based on all assessments conducted[.]" N.J.A.C. § 6A:14-3.5(c).

Accordingly, I hold that, although a school district may lawfully utilize a severe discrepancy approach to determine whether a child has an SLD, and employ a statically sound formula to measure whether a child has a severe discrepancy between aptitude and actual achievement, that formula may not be the sole determinant of whether a child has a SLD. *See* 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2); N.J.A.C. § 6A:14-2.5(a)(1); *M.B.,* 2010 WL 3035494 at *8. Rather, a school district must base its determination on *all* of its assessments of the child, N.J.A.C. § 6A:14-3.5(c), and on careful, documented consideration of parent input, teacher input, test results, and information concerning the child's health and background, 34 C.F.R. § 300.306(c)(1).

The next question is whether Sparta violated these procedural requirements.

### C. Whether Sparta Committed Such A Procedural Error, and Whether Any Such Error Was Corrected by the ALJ

This Court is required to review Sparta's decision for procedural regularity: "the Supreme Court has directed that a school district's liability for violations of the IDEA is a two-fold inquiry: (1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *P.C. v. Harding Twp. Bd. of Educ.,* 2013 U.S. Dist. LEXIS 107166 (D.N.J. July 31, 2013) (citing *Cape Henlopen,* 606 F.3d at 66)). To answer the first inquiry, I consider whether Sparta impermissibly relied exclusively on the statistical discrepancy formula, to the exclusion of other evidence that it was required to consider.

#### 1. *The Sparta Procedure invites procedural error*

Sparta promulgated its own procedure for making eligibility determinations, known as the "Procedure for Identification, Classification, Location, and Evaluation of Pupils Potentially with Educational Disabilities." (Joint Appendix at Ex. R-25, Ja483-84) This local procedure (the "Sparta Procedure") deviates significantly from the state and federal regulations promulgated under IDEA. And it therefore got Sparta off on the wrong foot.

The Sparta Procedure dictates that the school district use the severe discrepancy approach to determine if a child has a SLD. Contained in the Sparta Procedure is a "Severe Discrepancy Procedure for Specific Learning

Disability and Determination of Eligibility for Special Education and Related Services (N.J.A.C. 6A:14-3.5)." (*Id.*). To determine whether a pupil is eligible for special education because of a SLD, Sparta's Child Study Team (CST) is directed to find whether there is "a severe discrepancy between the student's current achievement and intellectual ability in one or more of the following areas: 1. Basic reading skills 2. Reading comprehension 3. Oral expression 4. Listening comprehension 5. Mathematical calculation 6. Mathematical problem solving 7. Written expression and 8. Reading fluency." (*Id.*).

To detect whether any such "severe discrepancy" exists, the Sparta Procedure directs the CST to "implement [a] statistically sound formula of a minimum for [sic] one and one half (1.5) standard deviations for all students grade K-12 (i.e. a minimum difference of 22 standard score points between achievement and aptitude.)" (*Id.*). Critically, the Sparta Procedure then states that "students who are performing poorly in school <u>may not</u> be identified as learning disabled if the amount of discrepancy…is not significant." (*Id.* (emphasis added)).

Under the Sparta Procedure, then, Sparta may not determine that a pupil has a SLD *unless* the CST finds by a "statistically sound" formula that there is a 1.5 standard deviation discrepancy between achievement and aptitude in one or more of eight learning categories.

The Sparta Procedure does not require the Eligibility Meeting Participants (what Sparta calls its "IEP team") to weigh or consider the various assessments gathered by the CST, or any other data, in making its determination. In fact, the procedure appears designed to avoid having such data play any role in the determination of whether a child has a SLD. *See id.* ("students…may not be identified as learning disabled if the amount of discrepancy…is not significant."). In any event, the people administering the Sparta Procedure seem to have understood it that way. *See* Section IV.C.2, *infra.*

So understood and so applied, Sparta's Procedure subverts the clear mandate of New Jersey and federal regulations requiring school districts to base their determinations on *all* assessments of a child, and on careful consideration of parent, teacher, and health professional input. *See* 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2); 34 C.F.R. § 300.306(c)(1); N.J.A.C. §§ 6A:14-2.5(a)(1), 6A:14-3.5(c); *M.B.,* 2010 WL 3035494 at *8.

### 2. That error materialized in this case

There is no doubt that Sparta's denial of eligibility was not based on any factor beyond the result of the statistical discrepancy formula. I do not cast blame; the IEP team, following the Sparta Procedure, would have found it difficult to do otherwise. But the evidence is overwhelming.

Sparta's written denial consisted of the one-paragraph "Statement of Eligibility" contained in Sparta's Eligibility Determination Report. (Ex. R-19, Ja440-41). It states that B.M. "does not meet criteria for Specific Learning Disability because there is not a severe discrepancy between current achievement and intellectual abilities in one or more prescribed areas." (*Id.* at Ja440).[13] It is still possible of course that the Eligibility Meeting participants considered the many sources of data available to them, but just failed to cite them. Sparta repeatedly points to the broad range of data gathered by the CST, and argues that the IEP team must be deemed to have relied on more than just the formula to arrive at its eligibility determination. (*See* Dfd's Br. Opp. Pltf's Mot. for Summ. J. at 8 ("The IEP team here used multiple assessment measures...as well as verbal and written input from B.M.'s teachers..."), 14 ("the District...used a plethora of assessment and functional performance data[.]"); Dfd's Reply Br. in Supp. Mot. Summ J. at 10 ("the IEP team used a plethora of assessments...")). Sparta's assertions, however, lack any substantial support in the evidence. And they are completely belied by the specific testimony of Sparta's own employees.

The witnesses consistently testified that the IEP team, in making its determination, followed the Sparta Procedure. They understood that procedure to prescribe the use of the severe discrepancy formula as the sole determinant of eligibility. To be sure, several of the witnesses were eager to discuss the variety of data that the CST had earlier gathered and reviewed. When pressed on the issue, however, they uniformly admitted that they (and their colleagues) did not rely on such data when making the eligibility determination. The testimony to which I refer is summarized at Section III.C, *supra*. I here cite a few pertinent examples.

Sparta's case manager in charge of B.M.'s 2009 evaluation described the analysis as follows: "We took a look at the specific learning disability category and we spent a lot of time looking at Dr. Sharma's evaluation results from Mrs.

_____

[13] Although plaintiff does not raise the issue, there is room for doubt as to whether Sparta fulfilled New Jersey's regulatory requirements for documenting SLD determinations. A school district must document SLD eligibility determinations with a written statement addressing ten important issues. N.J.A.C. § 6A:14-3.4(h)(4). Among these are "the basis for making the determination," "the relevant behavior noted during the observation," the "relationship of that behavior to the student's academic performance," "educationally relevant medical findings," and "whether the student achieves commensurate with his or her age[.]" *Id.* at §§ 6A:14-3.4(h)(4)(ii)-(v), (viii). These requirements appear to reinforce the requirements discussed at length above—that Sparta base its eligibility determination on all available assessments and evidence, and not a single formula.

The Statement of Eligibility (Ex. R-19 at Ja438-441) is very sketchy. Only two of the requirements are arguably addressed (albeit in a conclusory fashion): a statement whether B.M. had a SLD, and Sparta's basis for this determination. *Id.*

Anderson as well as Dr. Lorenz to see if again that would meet our district criteria for eligibility under specific learning disability and our conclusion there was there was not a severe discrepancy between his current achievement and his intellectual abilities." (Ja708-709). The "evaluation results" to which she refers are IQ scores and achievement test scores, which are the components analyzed within the severe discrepancy formula.

Sparta's learning consultant, Lucille Anderson, testified that, as a member of the CST, she consulted a wide variety of sources. Her written evaluation, however, dealt solely with B.M.'s achievement test scores (Ja904), which were plugged into the formula. The other records, she testified, were used "just to get a feel for where the student is." (*Id.*). Such information, she acknowledged, "does not equate to any eligibility." (*Id.*; *see also* Ja929-930).

Sparta's school psychologist, Susan Lorentz, confirmed that Sparta used a significant discrepancy model to determine SLD eligibility, "looking just for one and a half standard deviations—a one and a half standard deviation difference between their ability and their achievement, aptitude and achievement[.]" (Ja1006). Lorentz gathered information from teachers, parents, and B.M, including responses to the Connors Teacher Rating scale. Such information, however, went into her psychological *assessment* of B.M., not the determination as to his eligibility. (Ja1055-1058):

> Q.   I asked you – does this [*i.e.,* the Connors information] play into the determination in any way for determining whether a student would be eligible for special education and related services?
> A.   It just gives us–
> Q.   Yes or no.
> A.   -- No.

(Ja1059-1060).

School psychologist Cheryl O'Keefe testified that Sparta had a chart, (exhibit R-38 in the administrative record), demonstrating the combinations of full scale IQ scores and WISC-IV achievement scores that would trigger special education eligibility. (Ja1143-44). She stated that "subjective measures" such as teacher observations were not used because they are less "definitive." (Ja1144-1146). Sparta, she said, "relied on the standardized test scores to determine the severe discrepancy." (Ja1153-1154).

Likewise, Sparta's director of special services and eligibility meeting participant Linda Cooper distinguished between the *evaluation* process and the eligibility *determination* meeting. Ms. Cooper testified that the CST conducts evaluations of functional performance in the classroom simply because "you

know, you want to always, you know, look at the comprehensive picture of a student including functional [performance]." (Ja1211).

> Q.    Right. Under the discrepancy formula you just use basically numbers from the educational assessment and the psychological assessment, don't you?
>
> A.    Well, that's how you determine if a child is eligible for SLD, but there are other factors that go into the comprehensive evaluation, which I just described.
>
>       *   *   *
>
> Q.    In determining eligibility for SLD what is it – the district's – it's your testimony that the district only relies on the discrepancy formula?
>
> A.    That is – you know, that is what we use for the determination and that is – we are authorized to use that according to the code.
>
> Q.    So your answer is yes?
>
> A.    Yes.

(Ja1212-1214). Learning consultant Pamela Steel also confirmed that Sparta does not rely on factors other than the discrepancy formula to determine SLD eligibility. (*See* Ja1663-1664).

The regulations reflect a policy that such a sensitive decision cannot be entrusted to a process so rote and rigid. I certainly understand Sparta's desire to be objective; indeed, that is probably why the Department of Education permits the use of a statistically sound formula. The resulting number may be a useful indicator, or starting point, in the process of determining how far a student's achievement falls short of his potential. Still, IQ tests and achievement tests surely have their limits; report cards, the opinions of professional teachers, and other information have their place as well. A proper, holistic determination is one that respects the child by considering all available evidence. *See* 20 U.S.C. § 1414(b)(2)(B); N.J.A.C. § 6A:14-3.5(c); 34 C.F.R. § 300.306(c)(1).

In sum, the evidence establishes without a doubt that Sparta's IEP team, relying solely on the severe discrepancy formula while setting aside other data its CST gathered, impermissibly used a "single measure or assessment," or "single procedure," "as the sole criterion for determining whether [B.M.] is a child with a disability." *See* 20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2); N.J.A.C. § 6A:14-2.5(a)(2). Sparta's CST commendably and conscientiously gathered information about B.M. The SLD determination, however, in direct contravention of federal and New Jersey regulations under IDEA, rested solely on the statistical comparison of two test scores, effectively discarding the work of the CST.

### 3. Was Sparta's procedural error remedied by the ALJ?

Sparta prominently argues that it should prevail in this case because, even if it did not consider a broad array of data, the ALJ did. (*See, e.g.,* Br. Supp. Dfd.'s Mot. for Summ. J. at 9–30 (focusing completely on what the ALJ considered and determined); Br. Opp. Pltf.'s Mot. for Summ. J. at 5–6 ("the ALJ considered multiple indices...the ALJ determined...")). Plaintiffs reply that the IEP team, not the ALJ, makes eligibility determinations; "it is not [the ALJ]'s conduct vis-à-vis B.M. that is the issue in this case—it is the Board's conduct vis-à-vis this child." (Pltf's Br. Opp. Dfd's Mot. Summ. J. at 19).

I do not find that the ALJ went back and did what Sparta should have done. That is, he did *not* find, based on all of the evidence—statistical formula results plus all the other data gathered by the CST—that B.M. was ineligible for SLD classification. Rather, the ALJ Opinion notes, and approves, Sparta's determination of ineligibility on the basis of the statistical formula (*id.* at IV). The ALJ Opinion explicitly affirms the reasoning of the IEP Team because "a minimum of 1.5 standard deviations did not exist between achievement and ability." (*See* discussion of ALJ Opinion, *supra* at pp. 19–21).

True, the ALJ's Opinion cites the evidence gathered by the CST, as established by the witnesses who appeared before him. (Opinion, Findings of Fact at III). That data, however, does not penetrate the decision the ALJ ultimately made. Like Sparta's IEP Team, the ALJ, in his conclusions, cited only the formula results and did *not* tether his ultimate conclusion to the other data in any fashion. (*Id.*, Conclusions of Law at II.C). Nothing about the ALJ's findings and conclusions could be said to cure Sparta's faulty approach to determining B.M.'s eligibility.[14]

ALJ Moscowitz clearly took great pains to hear all the evidence and make appropriate findings of fact, which are well supported. But what the ALJ Opinion fails to do is escape the error that infected the Sparta Procedure and the IEP team's determination from the beginning. In places, that error takes the form of a conflation of the roles of the CST and the IEP Team. The ALJ notes that the CST (not the IEP team) determined B.M. ineligible for special education. (*See* Opinion, Findings of Fact at III.D). That statement elides the distinction between the CST, which investigates, and the IEP team, which made the challenged determination at the Eligibility Meeting. While perhaps no more than a slip of the pen, that statement renders misleading later statements, such as "the CST considered [B.M.'s] report cards, classroom work,

---

[14] There is, seemingly, an open legal question as to whether an ALJ may 'cure' a district's procedural defect (such as a failure to weigh any evidence other than the results of the statically sound formula), by making his or her own findings utilizing all of the evidence, in accord with the law set forth above. However, this question is not before me because it is clear that ALJ Moscowitz did not do this, or undertake to do this.

and teacher evaluations," and that "the CST relied on the private evaluations and the feedback from his parents." (*Id.* at Concl. of Law II.C). Taken literally, that statement is unobjectionable, but the implication does not follow that the decision maker (the IEP team) took those factors into account. At any rate, the evidence before the ALJ, including the statements of the IEP members themselves, clearly established that the IEP Team did not take them into account.

About Sparta's eligibility *determination*, it is clear from the ALJ Opinion that the only dispositive factor was the severe discrepancy statistical formula. (*See* Opinion, Findings of Fact at Part V ("Eligibility Determination") (finding that the determination was based on an application of "Sparta's documented procedure for determining SLD," which "includes a statistical formula, which requires a minimum of 1.5 standard deviations, or a minimum of 22 standard score points, between achievement and aptitude," and that in B.M.'s case, "a minimum of 1.5 standard deviations (or a minimum of 22 standard score points) did not exist between achievement and aptitude.")). And no other finding is possible in light of the evidence reviewed above. The ALJ's review seemingly then proceeded on the assumption that the IEP Team's determination was procedurally compliant because it followed the Sparta Procedure, without considering whether that Procedure is itself in conformity with the regulations. (*See id.*). The ALJ's decision, then, did not correct the flaws in Sparta's determination; the ALJ did not redo the IEP's decision with all of the required factors taken into account.

In short, the flaw in the Sparta IEP's decision is fundamental; Sparta's method of determining whether B.M. suffered from a SLD was not the multi-faceted determination required by federal and state law. Sparta, in making its eligibility determination, failed to meet a critical procedural requirement.

### D. V.M.'s Other Arguments

V.M. proffers four additional grounds for summary judgment. These I may dispose of with less discussion.

First, V.M. argues that Sparta failed to conduct a classroom observation, which also constitutes a procedural violation of IDEA. *See* 34 C.F.R. § 300.301(a); N.J.A.C. § 6A:14-3.4(f)(4)(i)(1) (requiring that an evaluation of a student suspect of having a SLD must include observation of "the student's academic performance in the general education classroom.")(*See* Pltf.'s Br. Supp. Mot. Summ. J. at 38-41). There is, however, evidence that Sparta conducted a classroom observation of B.M. It appears that such an observation was part of Lucille Anderson's educational evaluation. (R-28 at Ja506; Testimony of Anderson, Ja860, 881, 906-908). Thus, I do not agree with V.M.'s assertion that Sparta failed to conduct a classroom evaluation, but I do agree that Sparta "really did not take into account what was going on in the

classroom," (Pltf.'s Br. in Supp. of Mot. Summ. J. at 39), which constitutes part of Sparta's larger infraction discussed in depth, *supra.*

Second, V.M. argues that Sparta used flawed and unreliable IQ scores as input to its severe discrepancy analysis of B.M. (*Id.* at 40-44). While I understand V.M.'s impetus for this argument—Dr. Sharma's belief that the IQ score she obtained was not meaningful and should not be used—Plaintiff has not conclusively demonstrated the unreliability of the test results. Meanwhile, Sparta points to evidence tending to show that it obtained and used a reliable number in that Dr. Lorentz analyzed the scores that were obtained using the General Abilities Index. I find that this is a disputed factual issue and that I have no solid basis on which to overturn the ALJ's findings in this regard.

Third, V.M. demands that I deem B.M. disabled under the classification "Other Health Impair[ment]." (*Id.* at 44-45). V.M. provides less than a page of analysis on this topic, and based on the record there is a dispute on the operative issue of whether B.M. has or had ADHD that "adversely affects [his] educational performance," which would qualify him under this category. *See* N.J.A.C. § 6A:14-3.5(c)(9). The evidence on this matter is limited and contradictory, and Plaintiff's legal argument regarding what must be shown to entitle a pupil to this classification is extremely brief. Plaintiff focuses on a seeming acknowledgement by Sparta that B.M. has "ADHD, inattentive type," which arose from its neurological evaluation, (Eligibility Determination Report, Ex. R-19 at Ja440), while Sparta focuses on the evidence that B.M. did not suffer any serious problems due to ADHD. The evidence on this topic was poorly developed in the administrative procedure and V.M.'s briefing on the applicable legal standard for such classification is scanty. Thus, I cannot find in Plaintiff's favor on this claim.

Fourth, V.M. claims that Sparta's admission that B.M. ought to receive some extra help—but not special education—through an I&RS plan, actually constitutes an admission that B.M. needed special education, or a "Section 504" plan. The first part of this argument simply does not make sense. It is completely possible for a student to have issues warranting implementation of an I&RS plan but not entitling the student to special education. Plaintiff's argument is opaque at best, and lacks any discussion concerning what a Section 504 plan is and why B.M.'s case meets the applicable standard. I am unable to find in Plaintiff's favor on this claim.

## V.   REMEDIES FOR A PROCEDURAL VIOLATION

Based on the foregoing, I must enter summary judgment in V.M.'s favor on the issue of liability. The case now proceeds to the question of remedies. For discovery and other purposes, the case was bifurcated and the question of damages was put off until liability was determined. Discovery and briefing on

the issue of damages and attorneys' fees must now commence. (*See* Fourth Consent Order Amending Pretrial Scheduling Order, Doc. No. 24). I will refer the parties to the Magistrate Judge in order to schedule: 1) a period of discovery regarding damages and any other remedial matters; and 2) a deadline by which motions concerning any and all remedies sought or opposed must be made.

In an analogous situation, an appellate court, sitting in review of a trial court, would probably remand for further proceedings under the correct procedural and legal standards. That option seems impractical, and in any event I find no precedent for it. The primary mechanism for correction of error is ALJ review. Here, the ALJ might have taken evidence and redone the IEP's determination, taking all the proper factors into account. But because the procedural error was not recognized, that was not done. At this stage of the game, the focus must be on damages. Of course, the remedial questions may go beyond a simple calculation of damages, but those issues are so intertwined with the damages issues that they should be considered together. As outlined below, the parties will be requested to address those remedial questions in their submissions, following whatever additional discovery is required.

First, the basic principles: Compensatory relief, such as tuition reimbursement for an appropriate private school placement, is available if a FAPE is denied or if a procedural violation, on its own, rises to the level of a FAPE denial. *See Cape Henlopen*, 606 F.3d at 66-67. The school authorities have the ultimate burden of showing that they did not deny the student a FAPE. *Shore* at 199 (citing *Boro. of Clementon*, 995 F.2d 1204, 1219 (3d Cir. 1993)). That is, "the school must establish that it complied with the procedures set out in the IDEA" and that the IEP it offered (if any) "was 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential.'" *Shore* at 199 (citing *Board of Ed. v. Hendrick Hudson Central*, 458 U.S. 176, 206-7 (1982)). If the school did not provide a FAPE, then the District Court must decide whether the parent's unilateral placement of the child was appropriate. *Id.* (citing *Michael C. v. Radnor Twp.*, 202 F.3d 642, 651 (3d Cir. 2000).

The error here, although procedural, affected everything that followed. That poses a more nuanced issue than simple denial of a FAPE. To be sure, "[a] procedural violation is actionable under the IDEA." It is compensable "if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010) (citing 20 U.S.C. § 1415(f)(3)(E)); *P.C. v. Harding Twp. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 107166 at *21 (D.N.J. July 31, 2013)(Martini, J.)(quoting *id.* at 565).

A clear case for a full award of compensatory damages would be a procedural error that resulted in a denial that was substantively wrong under

IDEA. At the other end of the spectrum, a minor procedural flaw would not necessarily entitle parents to reimbursement for a private school education. Consider a hypothetical case in which the school district failed to consider a required piece of evidence (call it "X"). Suppose further that X did not in fact favor the parents' position, or even that it actually tended to show that the child was *not* entitled to a FAPE. Would this bare procedural error, without real-world consequences, entitle the plaintiff to full reimbursement of educational expenses? And what about a procedural error that "deprives parents of their participation rights"? *D.S., supra.* Does any party contend that those rights should be assigned a dollar value here? These questions should be addressed in the parties' remedial submissions.

This Court must determine what the plaintiff has been deprived of, and what relief would make plaintiff whole. Thus the parties should also address the question of whether that requires me to perform the analysis that Sparta did not: *i.e.,* to make a substantive determination under IDEA, based on all of the required evidence, as to whether B.M. had a SLD in 2009 that entitled him to a FAPE (remembering, of course, that the school has the burden on that issue). That would present the "clear case" for a full award of compensatory damages that I hypothesized above. But it may also be that the procedural shortcomings, in themselves, rose to the level of depriving B.M. of a FAPE. Or it may be that the deprivation is a lesser one, requiring a lesser measure of damages. These matters have not yet been adequately addressed in the submissions. (I do not find fault; as suggested above, the situation is a byproduct of the scheduling order, which properly bifurcated the issues and reserved remedial issues until liability was determined.)

I repeat that I do not now decide these issues, but raise them as questions to be addressed in the first instance by the parties. As the parties embark on the remedial phase of this lawsuit, the likely issues will include: 1) whether and to what extent this procedural violation has caused "substantive harm" to V.M. or B.M., up to and including denial of a FAPE; 2) whether and to what extent any award of private school tuition reimbursement should be reduced or eliminated based on the factors set forth in 20 U.S.C. § 1412(a)(10)(C)(iii); and 3) whether and to what extent Sparta is liable for any of V.M.'s legal fees. Those issues should be addressed in the parties' damages submissions, after appropriate discovery, supervised and coordinated by Magistrate Judge Hammer.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART**, Defendant's Motion for Summary Judgment is **DENIED**, and the Final Administrative Decision in favor of Defendant is **REVERSED**.

HON. KEVIN MCNULTY
United States District Judge

Dated: July 3, 2014
Newark, New Jersey

36